## UNITED STATES *v.* SINGER MANUFACTURING CO.

No. 438. Argued April 25, 29, 1963.—Decided June 17, 1963.

*Daniel M. Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Cox, Assistant Attorney General Loevinger, Robert B. Hummel* and *Les J. Weinstein.*

*Arthur E. Pettit* argued the cause for appellee. With him on the brief were *Edwin J. Wesely, Terence H. Benbow* and *Edward A. Miller.*

Mr. Justice Clark delivered the opinion of the Court.

This is a direct appeal from the judgment of the United States District Court for the Southern District of New York, 205 F. Supp. 394, dismissing a civil antitrust action brought by the United States against the Singer Manufacturing Company to prevent and restrain alleged violations of §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2. The complaint alleged that Singer combined and conspired with two competitors, Gegauf of Switzerland and Vigorelli of Italy, to restrain and monopolize and that Singer unilaterally attempted to monopolize interstate and foreign trade in the importation, sale and distribution of household zigzag sewing machines. The District Court dismissed after an extended trial, concluding that the charges were without merit. The United States appealed under § 2 of the Expediting Act, 15 U. S. C. § 29, but has abandoned its claim as to attempted monopolization. We noted probable jurisdiction in light of the fact that unless we did so the parties would be deprived of any appellate review in the case. 371 U. S. 918. We have examined the record (1,723 pages) in detail, as is necessary in these direct appeals,[1] and upon consideration of it, as well as the briefs and argument of counsel, have concluded that there was a conspiracy to exclude Japanese competitors in household zigzag sewing machines and that the judgment must be reversed.

---

[1] Whatever may have been the wisdom of the Expediting Act in providing direct appeals in antitrust cases at the time of its enactment in 1903, time has proven it unsatisfactory. See, *e. g.,* Gesell, A Much Needed Reform—Repeal the Expediting Act for Antitrust Cases, in 1961 N. Y. State Bar Assn. Antitrust L. Sym. 98 (CCH). Direct appeals not only place a great burden on the Court but also deprive us of the valuable assistance of the Courts of Appeals.

I.

The details of the facts are long and complicated. The amended and corrected opinion of the District Court includes not only a description of the sewing machines involved and their operation but also an analysis of the patents covering them. We shall, therefore, not relate the facts in detail but satisfy ourselves with the overriding ones.

A. As the District Court stated, this action "concerns only the United States trade and commerce arising from the importation into the United States of a particular type of household sewing machine known as the 'machine-carried multicam zigzag machine.'" 205 F. Supp., at 396. The zigzag stitch machine produces various ornamental and functional zigzag stitches as well as straight ones. The automatic multicam zigzag machine, unlike the manually operated zigzag and the replaceable cam machine, each of which requires hand manipulation or insertion, operates in response to the turning of a knob or dial on the exterior of the machine. While the multicam machines involved here function in slightly different ways, all are a variant of the same basic principle.

B. Singer is the sole United States manufacturer of household zigzag sewing machines. In addition to the multicam variety at issue here, it produces replaceable cam machines but not the manually operated zigzag. Singer sells these machines in this country through a wholly owned subsidiary and in various foreign countries through independent distributors. Singer's sales comprised approximately 61.4% of all domestic sales in multicam zigzag machines in the United States in 1959. During the same year some 22.6% were imported from Japan and about 16% from Europe. In 1958 Singer's percentage was 69.6%, Japanese imports 20.7% and European imports 9.7%. Further, Singer's 1959 and

1960 domestic sales of multicam machines amounted to approximately $46 million per year, in each of which years such sales accounted for about 45% of all its domestic sewing machine sales.

C. It appears that Singer by April 29, 1953, through its experimental department, had completed a design of a multiple cam zigzag mechanism in what it calls the Singer "401" machine. It is disclosed in Singer's Johnson Patent. In 1953 Singer was also developing its Perla Patent as used in its "306" replaceable cam machine and in 1954 its "319" machine-carried multiple cam machine. In September of 1953 Vigorelli, an Italian corporation, introduced in the United States a sewing machine incorporating a stack of cams with a single follower. Singer concluded that Vigorelli had on file applications covering its machine in the various patent offices in the world and that the Singer design would infringe. On June 10, 1955, Singer bought for $8,000 a patent disclosing a plurality of cams with a single cam follower from Carl Harris, a Canadian. It was believed that this patent, filed June 9, 1952, might be reissued with claims covering the Singer 401 as well as its 319 machine, and that the reissued patent would dominate the Vigorelli machine as well as a Japanese one introduced into the United States in September 1954 by Brother International Corporation. Thereafter Singer concluded that litigation would result between it and Vigorelli unless a cross-licensing agreement could be made, and this was effected on November 17, 1955. The license was nonexclusive, world-wide and royalty free. The trial court found that Singer's only purpose was to effect a cross-licensing, but certain correspondence does cast some shadow upon these negotiations.[2] The agree-

---

[2] "Unless we are able to come to some agreement with Vigorelli, we will of course institute proceedings in Italy in due time, seeking to invalidate such patent as Vigorelli has received and we will do the same thing in France and other countries in accordance with the

ment also contained provisions by which each of the parties. agreed not to bring any infringement action against the other "in any country" or institute against the other any opposition, nullity or invalidation proceedings in any country. In accordance with this agreement Singer withdrew its opposition to Vigorelli's patent application in Brazil and Vigorelli later (1958) abandoned a United States interference to the Johnson application which cleared the way for the Johnson Patent to issue on December 2 of that year.

D. While Singer was negotiating the cross-license agreement. with Vigorelli it learned that Gegauf, a Swiss corporation, had a patent covering a multiple cam mechanism. This placed an additional cloud over Singer's Harris reissue plan because the Gegauf patent enjoyed an effective priority date in Italy of May 31, 1952. This was nine days earlier than Singer's Harris patent filing date in the United States. In December 1955 Singer learned that Gegauf and Vigorelli had entered a cross-licensing agreement covering their multiple cam patents similar to the Vigorelli-Singer agreement. In January 1956 Singer found that Gegauf had pending an application in the United States Patent Office and assumed that it was based on the same priority date, i. e.,

---

proper procedure in each country. This litigation will undoubtedly result either in the cancelling of their patent and patent applications, or at any rate, severely limit the claims. On the other .hand, if we were to refrain. from instituting such proceedings and if we were to withdraw the Brazilian opposition, their applications might develop into rather broad patents which would have a dominating position in the industry. We ourselves hold some patents and have patent applications pending .which would make trouble for Vigorelli if we were engaged in litigation with them, or which would . greatly strengthen and broaden the patent situation if our position and theirs could be pooled by some, mutual agreement." Letter from M. C. Lightner, Singer President, to W. P. Evans of Singer's Italian Corporation, September 12, 1955.

May 31, 1952. If this was true Singer could use its Harris reissue patent only to oppose through interference the allowance of broad claims to Gegauf. It therefore made preparation to negotiate with Gegauf, first approaching Vigorelli in order to ascertain how the latter had induced Gegauf to grant him a royalty-free license and drop any claim of infringement. Singer made direct arrangements for a conference with Gegauf for April 12, 1956, and the license agreement was made April 14, 1956.

The setting for this meeting was that Gegauf had a dominant Swiss patent with applications in Germany, Italy, and the United States-all prior to Singer. In addition, Singer's counsel had examined Gegauf's Swiss patent and advised that it was valid. Singer opened conversation with indications of coming litigation on the Harris patent, concealing the Johnson and Perla applications. Gegauf felt secure in his patent claims but insecure with reference to the inroads the Japanese machines were making on the United States market. It was this "lever" which Singer used to secure the license, pointing out that without an agreement Gegauf and Singer might litigate for a protracted period; that they should not be fighting each other as that would only delay the issue of their respective patents; and, finally, that they should-license each other and get their respective patents "so they could be enforced by whoever would own the particular patent." Singer in the discussions worked upon these Gegauf fears of Japanese competition "because one of the strong points" of its argument was that an agreement should be made "in order to fight against this Japanese competition in their building a machine that in any way reads on the patents of ourselves and of Bernina [Gegauf] which are in conflict."[3] The trial judge found that the only pur-

---

[3] Memorandum from M. L. Waterman, Singer Vice President, to M. C. Lightner, April 13, 1956. .

pose "disclosed to Gegauf, and in fact the very one used to convince Gegauf of the advisability of entering into an agreement" was to "obtain protection against the Japanese machines which might be made under the Gegauf patent; this sprang from a fear which Singer had good reason to believe to be well founded." 205 F. Supp., at 413. While he found Singer's "underlying, dominant and sole purpose . . . was to settle the conflict in priority between the Gegauf and Harris patents and to secure for Singer a license right under the earlier patent," *ibid.*, it is significant that no such overriding purpose was found to have been disclosed to Gegauf.

The license agreement covered (1) the Singer-Harris patent and its reissue application in the United States and nine corresponding foreign ones, and (2) the Gegauf Swiss, Italian and German patents, as well as the United States and German applications covering the same. The parties agreed in the first paragraph of the agreement "not to do anything, either directly or indirectly and in any country, the result of which might restrict the scope of the claims of the other party relating to the subject matter of the above mentioned patents and patent applications." In addition "each undertakes, in accordance with the laws and regulations of the Patent Office concerned, to facilitate the allowance in any country of claims as broad as possible, as regards the subject matter of the patents and patent applications referred to above." The parties also agreed not to sue one another on the basis of any of the patents or applications. Singer agreed not to make a "slavish" copy of Gegauf's machine and to give Gegauf "the amical assistance of its patent attorneys for the defense of any of the above mentioned Gegauf patents or patent applications against an action in cancellation." The agreement made no mention of Singer's Perla or Johnson applications, the existence of which Singer did not wish Gegauf to know.

E. Approximately one week after the Gegauf cross-license agreement Singer met with Vigorelli at Milan, Italy, at the latter's request. Vigorelli at this meeting suggested that Singer, Gegauf and Vigorelli, having arrived at their respective agreements, should act in concert in prosecuting their patents against all others in the field. This was out of the question, Singer immediately replied, advising that "what appeared to us to be proper action was for each one to prosecute his own patents and take care of any cases of infringement that might appear." [4] The subsequent conversations at the meeting are reported from the same source as follows:

"Upon learning that there could be no joint action by the three companies who have been mentioned in prosecuting patents against all others in the field, that subject was dropped . . . .

"At this point, it should perhaps be mentioned that Mr. Stanford and I have discussed between ourselves whether we should say anything to Mr. Gegauf about our feeling that we could prosecute his patents that will be issued sometime within the next few months in the United States better than perhaps he could if we owned them, but we had decided not to say anything to Mr. Gegauf about this at this time.

"In talking with Mr. Vigorelli's lawyer, Mr. Stanford dropped this view to him. The point was immediately understood, and the question was raised if we would have any objection if they were to pass the word on to Mr. Gegauf that they were raising this point. We said that, of course, we would have no objection but that we ourselves did not wish to do this, and we would not want the suggestion coming to Mr. Gegauf at this time as from us. If they wanted to suggest it, it was all right. We would, of

[4] M. L. Waterman, notes dictated at Milan, April 20, 1956.

course, under such an arrangement have to give a license to Gegauf under the patent that he would turn over to us. Mr. Stanford believes that he would be able before the patent is issued to rewrite the claims and make it stronger than it now is and that it is a fact that, being in the United States, we would be better able to prosecute any claims against this patent than would Mr. Gegauf."

While the testimony of Mr. Stanford, Singer's patent attorney, varies somewhat from this memorandum of Mr. Waterman, it is substantially the same.[5] That the approach to Gegauf was not casually laid is shown by a May 7, 1956, letter from Mr. Stanford to Patent Department employees of Singer in which he said, "When in Italy we laid careful plans for Gegauf to be advised by a third

[5] Mr. Stanford testified that a Mr. Majnoni, patent attorney present for Vigorelli, came over to him as the discussions (which were in Italian and English as some participants spoke only their native tongue) were more or less over and said that he would like to speak in English. He asked "about the situation here in the United States between Gegauf and the Harris patent . . . ." Stanford replied "that they would probably be locked in interference very shortly; that Gegauf was ahead of us and that I was very much afraid that Gegauf was going to win the interference, that I was sorry because I felt that if we had the claims and were able to keep them in the Harris patent, we would be able to enforce them better than could [Gegauf] if he had a patent . . . ." Stanford told Majnoni that Singer had made no approaches to Gegauf because the price would "go sky high"; Majnoni said that he knew Mr. Gegauf's attorney, had "frequent contacts with him" and offered to approach him. Stanford said he "didn't think that would do any good; that I thought that would be just as bad." Majnoni replied that he would let him think it came directly from him. "I think," he added, "it would be advantageous . . . if Singer owned the claims . . . ." Stanford interpreted this to mean that Majnoni thought it would be better for Vigorelli "if Singer, who was a corporation in the United States, owned the Gegauf patent and they would rather have Singer own it than have Gegauf because they thought that we could enforce it better or were in a better position to enforce it."

party that Singer could best handle the patent situation if we owned the Gegauf U. S. Patent. Think it will bear fruit. This suggestion, with the U. S. attorney situation is pressure in the right direction."

Mr. Majnoni reported in June 1956 that he had the "opportunity of talking to the Patent Attorneys of Mr. F. Gegauf on a number of occasions" concerning "the question of the advantage of the American Singer Company being in possession of the different patents which might be useful in defence of sewing machines with multiple cams . . . ." He stated that "the particular character of the question," i. e., "the possibility and advantage that the Gegauf patent application in the States be assigned to Singer," required that the approach be in "such a way as to prompt an initiative to this end by Gegauf." He was hopeful that this had been accomplished. Thereafter on September 19 Dr. S. Lando, Singer representative in Milan, reported that Majnoni advised that Gegauf "is today effectively willing to transfer his patent application in the U. S. to the Singer, without regard or with little regard to the financial side of the matter." This was brought about, he said, by discussions between Vigorelli and Gegauf concerning a United States Van Tuyl patent and its effect upon the validity of the Gegauf German patent; that Gegauf had "made informally known to Mr. Vigorelli that the withdrawing of the Vigorelli application in the U. S. would be greatly appreciated, to prevent the issuance of a printed patent wherein the fact that the Van Tuyl patent exists will be made known to third parties"; that Vigorelli had agreed to withdraw his application and that as a consequence Vigorelli would "drop any direct means adapted to protect his machines in the U. S., but he is quite sure that Singer will take care of the protection of the machines of the general type of interest, by making use of the owned Harris and Gegauf patents."

In the summer of 1956 Mr. F. Gegauf, Jr., and his sister attended a sewing machine convention at Kansas City. On returning home they met with Singer (Messrs. Waterman & Stanford) in Singer's office in New York City. Gegauf expressed concern over the number of Japanese machines that he had seen at the convention. Singer again found opportunity to employ the Japanese problem and stressed to Gegauf, Jr., the difficulties of enforcing a patent in the United States—namely, large number of importers, size of the country, number of judicial circuits, etc. Singer emphasized that these all presented problems to the owner of a United States patent. Singer being in the United States could, they said, enforce the patent better than Gegauf could. They asked Gegauf, Jr., whether he thought his father would be interested in selling the patent to Singer. Thereafter, on September 3, Gegauf, Jr. wrote Mr. Waterman that Singer's suggestion had been taken up with Gegauf, Sr., and "we might be interested in such an agreement." The closing paragraph says: "We agree that something should be done against Japanese competition in your country and maybe South America and are therefore looking forward to your early reply." Waterman replied on September 7 that he and Mr. Stanford would be in Germany on September 18 through 25; he asked that Gegauf's United States patent attorney be directed to meet with Stanford in New York City with authorization to disclose the content of the Gegauf patent application so that time might be saved in Europe. Mr. Waterman closed with the belief "that it may be possible that we can both strengthen our positions with respect to the Japanese competition which you mention . . . ." The conference was set for September 23 at which time Gegauf demanded $250,000 for the patent and negotiations broke off. Singer wrote Dr. Lando, its Milan agent, on October 9, informing him. The letter closed with this paragraph:

"I thought you would like to have this information if the subject should come up in talking with Mr. Vigorelli or his attorney." And on October 24 Singer wrote Mr. Gegauf advising that the United States Patent Office had declared an interference between their patent applications; that their cross-license agreement provided that this interference be settled in accordance with the patent laws of the United States; that "since . . . interference proceedings are usually time consuming and costly to the parties involved, it would appear that it would be advantageous for us to settle the interference between ourselves rather than to continue the proceeding and rely on the United States Patent Office finally to award a priority"; and finally Singer suggested that the attorneys for the parties in the United States get together with a view to settling the interference. Singer abandoned its interference on March 15, 1957, and the Gegauf claim was taken verbatim from the Singer Harris reissue claim.

Nothing more was done by Singer toward securing the Gegauf application until September 12, 1957, when Singer wrote Gegauf that its Harris application was about to be issued as a patent. It also anticipated that several other patents relating to ornamental stitch machines would soon be issued to it and presumed Gegauf's application would soon be granted. Then followed this paragraph:

> "When I had the pleasure of meeting you last fall we had some discussion relative to the procedures that might be followed to enforce the patents . . . , when issued, against infringing manufacturers who primarily are manufacturers in other countries seeking markets in the United States, and more and more throughout the entire world. These manufacturers are bringing out a large variety of ornamental stitch machines which would appear to come within the

terms of claims which may be awarded in the United States with respect of the aforementioned Singer and Gegauf patents. A proper enforcement of these patents may make it necessary to instigate patent suits against each of the importers in the United States, of whom there will perhaps be many. I think you will agree with me that neither one of us alone can protect himself most effectively." [6]

This letter brought on a meeting of the parties in Zurich on October 16, 1957. Gegauf's position was that, as the trial court found, "while it had no objection 'to making an agreement with Singer, in order to stop as far as possible Japanese competitors in the United States market,' it was willing to do so only under certain conditions." 205 F. Supp., at 416. Finally, as the trial court found, Gegauf demanded $125,000 plus certain conditions declaring that it "was cheap and that it could not go lower since it could get more money if it licensed the invention. Kirker [of Singer] replied that there was no comparison since a sale to Singer was insurance against common competitors

---

[6] This letter is substantially the same as the proposed letter which Mr. Stanford sent Mr. Waterman for transmittal to Gegauf, except that the quoted paragraph was phrased more directly in the proposed letter:

"You are no doubt aware that recently the many Japanese sewing machine manufacturers have brought out a large variety of ornamental stitch machines which would appear to come within the terms of claims which may be awarded in the United States with respect of the above Gegauf and Singer patents. We have reason to believe that all of the very many United States sewing machine importers will wish to deal in such Japanese ornamental stitch machines, and that patent suits against each of these importers may be necessary if our respective patents are to be enforced.

"Your [sic] may agree with us that under the terms of our present agreement neither party is in a position effectively to protect itself through patents in the United States with respect to this threatened competition, particularly when the competing machines are copies after both Bernina and Singer models."

and that was why Singer was willing to pay." *Ibid.* In another exchange Gegauf

> "advanced the argument that, if stopped by Singer in the United States, the Japanese manufacturers would run to Europe; to this Singer answered that a greater risk was run in Europe if Singer were not permitted to first stop infringements in the United States. . . . Singer continued 'to drive home the point' that Gegauf stood to benefit more by enforcement of the patents in the United States because the 'Brother Pacesetter' machine, a big selling and patent infringing Japanese-made machine, was in direct competition with the Gegauf machine, for both machines were of the free arm type." 205 F. Supp., at 417.

Finally Gegauf assigned to Singer its application and all rights in the invention claimed and to all United States patents which might be granted under it for $90,000. The accompanying agreement provided that (1) Singer would grant Gegauf a nonexclusive royalty-free license to sell in the United States sewing machines made in Gegauf's factory in Switzerland; (2) Singer would not institute, without the consent of Gegauf, legal proceedings asserting the patents when issued against Pfaff in Germany or Vigorelli in Italy with respect to machines manufactured in their home factories; and (3) Singer would not make a "slavish" copy of Gegauf's Bernina machine.

F. The Gegauf patent issued on April 29, 1958, and Singer filed two infringement suits against Brother, the largest domestic importer of Japanese machines. It also sued two other distributors of multicam machines, those actions terminating in consent decrees. Finally, in January 1959, eight months after the patent was issued, Singer brought a proceeding before the United States Tariff Commission under § 337 of the Tariff Act of 1930, 19 U. S. C.

§ 1337.  It sought an order of the President of the United States excluding all imported machines coming within the claims of the Gegauf patent for the term of the patent, naming European as well as Japanese infringers.   Singer alleged that the tremendous volume of imports from Japan of household sewing machines, other than automatic zig-zag, had eliminated all domestic manufacturers save itself and one small straight stitch part-time concern. It further alleged that the increasing volume of infringing imports similarly threatened to result in the curtailment and ultimate cessation of manufacturing operations in the United States in automatic zigzags, with heavy loss of highly paid and skilled labor and large capital investment.   At the time of the filing, Singer alleged, foreign-made machines, "primarily from Japan," were being imported to the extent of 50% of the entire Singer sales of automatic zigzag machines in this country; it represented that the automatic zigzag machine is its most important product and that it sells for a minimum price of $300; that infringers from Japan sell at no firm price, the average being $100 less than Singer's price but often far below that figure; and that the minimum price in  Japan for export is $40 to $54.

During the hearing on its complaint Singer was asked whether Pfaff was licensed under the Gegauf patent. Singer replied in the negative but became skeptical and, believing that it might "have a better chance of prevailing before the Tariff Commission," decided to ask Gegauf to revise the agreement, which originally excepted Pfaff and Vigorelli from enforcement proceedings, except on consent of Gegauf.   The latter agreed on condition that Phoenix, a German manufacturer which was a party-defendant in the proceedings, be substituted.

Upon commencement of this action by the United States, the Commission stayed the proceedings, and they are now in abeyance pending our disposition of this case.

## II.

First it may be helpful to set out what is not involved in this case. There is no claim by the Government that it is illegal for one merely to acquire a patent in order to exclude his competitors; or that the owner of a lawfully acquired patent cannot use the patent laws to exclude all infringers of the patent; or that a licensee cannot lawfully acquire the covering patent in order better to enforce it on his own account, even when the patent dominates an industry in which the licensee is the dominant firm. Therefore, we put all these matters aside without discussion.

What is claimed here is that Singer engaged in a series of transactions with Gegauf and Vigorelli for an illegal purpose, i. e., to rid itself and Gegauf, together, perhaps, with Vigorelli, of infringements by their common competitors, the Japanese manufacturers. The Government claims that in this respect there were an identity of purpose among the parties and actions pursuant thereto that in law amount to a combination or conspiracy violative of the Sherman Act. It claims that this can be established under the findings of the District Court.

We note from the findings that the importation of Japanese household multicam zigzag sewing machines first came to notice in the United States in 1954 with the introduction of such a machine by the Brother International Corporation. It incorporated the mechanism of the Vigorelli zigzag and the Singer 401 machines. By 1959 importations of all Japanese household sewing machines reached 1,100,000, while importations of European machines reached only 100,000. Moreover, it appears that all but two domestic manufacturers were put out of business in three to four years after the Japanese machines first appeared. The two remaining domestic manufacturers were Singer and a company not specializing in sew-

ing machines, which manufactured only straight stitch machines on order for a single domestic customer.

The trial court found that no mention was made of the Japanese machines during the negotiations covering the Vigorelli cross-licensing agreement with Singer. It first appeared during the Gegauf licensing negotiations where at those meetings Singer used "protection against the Japanese" as "one of the strong points" on the cross-licensing of the Gegauf and Harris patents and applications. Here, though the trial court stated that the "dominant and sole purpose of the license agreement was to settle the conflict in priority," it specifically, in the next paragraph of its opinion, found a "secondary" purpose, i. e., protection against the Japanese machines which were infringing the Gegauf patent. In this connection it is most important to note another finding of the trial court, namely, that this purpose to exclude the Japanese "was the only one disclosed to Gegauf, and in fact the very one used to convince Gegauf of the advisability of entering into an agreement." 205 F. Supp., at 413. Under these findings it cannot be said that settlement of the conflict in priority was the "dominant and sole purpose" of Singer. Indeed, the two findings are in direct conflict. Furthermore the fact that the cross-license agreement provided that Singer and Gegauf would facilitate the allowance to each other of claims "as broad as possible" indicates a desire to secure as broad coverage for the patent as possible, the more effectively to stifle competition, the overwhelming percentage of which was Japanese. This effect was accomplished, for when the Patent Office placed the Harris (Singer) and Gegauf patents in interference, Singer abandoned the proceeding, thus facilitating the issuance of broad claims to Gegauf.[7]

---

[7] Since we have concluded that the entire course of dealings between the parties, including the cross-license agreement, establishes a conspiracy or combination in violation of the Sherman Act, we need not

We now come to the assignment of the Gegauf patent to Singer. The trial court found: (1) that six days after the license agreement was made with Gegauf, Singer proceeded to Italy where a conference was held with Vigorelli. At this meeting two events took place that led to the later acquisition of the patent by Singer. The first was Vigorelli's proposal that Singer, Gegauf and himself act "in concert against others" in enforcing the patent. This was rejected by Singer's representatives, who said it was best for each "to prosecute his own patents." At the same meeting, however, Singer proposed to Vigorelli that it could prosecute the Gegauf patent in the United States better than Gegauf and, after Vigorelli agreed, solicited his help in getting Gegauf to agree to assign the patent. (2) Vigorelli went to Gegauf "acting as Singer's agent," 205 F. Supp., at 414, and convinced the latter sufficiently for him to write Singer that he favored the idea of doing something "against Japanese competition." (3) Singer replied to Gegauf by letter that an arrangement could be reached "equally advantageous to both." (4) Singer went to Europe but was not able to agree on Gegauf's terms and thereafter, in September 1957, wrote the latter that "their mutual interests required that something be done to protect themselves from the Japanese infringing machines." (5) Gegauf replied that he would be happy to meet Singer to discuss "mutual enforcement" of its United States application and the Harris reissue. Then, (6) in the final conferences in Europe Gegauf told Singer that he had no objection "to making an agreement with Singer, in order to stop as far as possible Japanese competitors in the United States market." Further, the trial court found that Singer assured Gegauf that "Singer was in-

and do not pass on the Government's contention that the cross-license agreement and the interference settlement are illegal apart from the other circumstances present here. As to this question, see Note, 31 Geo. Wash. L. Rev. 643 (1963).

surance against common competitors" and Gegauf's fears that if Singer stopped the Japanese infringements in the United States they (the Japanese) would go to Europe, where Gegauf was not in as good a position to stop them, were unfounded because a greater risk was run in Europe if Singer were not permitted to first stop infringements in the United States. Finally, the court found that (7) Singer was determined "to drive home the point" that Gegauf stood to benefit more by enforcement of the patents in the United States because the "Brother Pacesetter" machine, a big selling and patent infringing Japanese-made machine, was in direct competition with the Gegauf machine in the United States. As the trial court put it, "[t]he point apparently reached home"— Gegauf ultimately assigned the patent for only $90,000, much less than its original asking price and much less than Gegauf believed it would realize *annually* from a license grant. Gegauf's beliefs as to the inadequacy of the *monetary* consideration were well founded, since Singer received more than twice that amount in a two-year period from the one license it granted under the Gegauf patent. That license, incidentally, was to Sears, Roebuck & Company, which imported machines from Europe.

### III.

As we have noted with reference to the cross-license agreement, the trial court decided that "[t]he undisputed facts support no conclusion other than that the underlying, dominant and sole purpose of the license agreement was to settle the conflict in priority between the Gegauf and Harris patents . . . ." We have rejected this conclusion on the trial court's own finding in the next paragraph of the opinion that Singer's "secondary" purpose, the only one disclosed to Gegauf, was its "desire to obtain protection against the Japanese machines which might be made under the Gegauf patent." Likewise we reject,

as a question of law, the court's inference that the attitude of suspicion, wariness and self-preservation of the parties negated a conspiracy. See *United States* v. *Line Material Co.*, 333 U. S. 287, 297 (1948); *United States* v. *Masonite Corp.*, 316 U. S. 265, 280–281 (1942); *United States* v. *General Electric Co.*, 80 F. Supp. 989, 997–998 (S. D. N. Y. 1948).

The trial court held that the fact that Singer had a purpose, which "Gegauf well knew," of enforcing the patent upon its acquisition, that the enforcement "would most certainly include Japanese manufacturers who were the principal infringers," and "that Gegauf shared with Singer a common concern over Japanese competition" did not establish a conspiracy. 205 F. Supp., at 419. Given the court's own findings and the clear import of the record, it is apparent that its conclusions were predicated upon "an erroneous interpretation of the standard to be applied. . . ." Thus, "[b]ecause of the nature of the District Court's error we are reviewing a question of law, namely, whether the District Court applied the proper standard to essentially undisputed facts." *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 44 (1960). There in a discussion of a like problem we held that "the inference of an agreement in violation of the Sherman Act" is not "merely limited to particular fact complexes," *ibid.*, citing *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707 (1944), and *Federal Trade Comm'n* v. *Beech-Nut Packing Co.*, 257 U. S. 441 (1922). "Both cases," the Court continued, "teach that judicial inquiry is not to stop with a search of the record for evidence of purely contractual arrangements. . . ." *Ibid.* Whether the conspiracy was achieved by agreement, by tacit understanding, or by "acquiescence . . . coupled with assistance in effectuating its purpose is immaterial." *United States* v. *Bausch & Lomb, supra,* at 723. Here the patent was put in Singer's hands to

achieve the common purpose of enforcement "equally advantageous to both" Singer and Gegauf and to Vigorelli as well.[8] What Singer had refused Vigorelli, *i. e.,* acting "in concert against others," was thus achieved by the simple expedient of transferring the patent to Singer.

Thus by entwining itself with Gegauf and Vigorelli in such a program Singer went far beyond its claimed purpose of merely protecting its own 401 machine—it was protecting Gegauf and Vigorelli, the sole licensees under the patent at the time, under the same umbrella. This the Sherman Act will not permit. As the Court held in *Frey & Son, Inc.,* v. *Cudahy Packing Co.,* 256 U. S. 208, 210 (1921), the conspiracy arises implicitly from the course of dealing of the parties, here resulting in Singer's obligation to enforce the patent to the benefit of all three parties. While there was no contract so stipulating, the facts as found by the trial court indicate a common purpose [9] to suppress the Japanese machine competition

---

[8] In addition, though the parties do not discuss the effect of the final arrangement, it would permit both Gegauf and Vigorelli to sell machines under the patent in the United States. The fact that this might be consequential is indicated by the statistic that in 1959 Europe furnished 16% of the machines sold in the United States.

[9] The trial court's findings, as we have noted, are inconsistent in some respects. The court repeatedly described the role of the parties' "mutual interests" in the achievement of an agreement to assign the Gegauf patent to Singer. It also found that "Gegauf shared with Singer a common concern over Japanese competition," 205 F. Supp., at 419, and that both parties knew that Singer wanted the patent in order to enforce it against their common competitors, the Japanese. Still, at one point, the court states that "their dealings were characterized by an absence of unity or identity of any common purpose or motive." 205 F. Supp., at 418. Insofar as that conclusion derived from the court's application of an improper standard to the facts, it may be corrected as a matter of law. Insofar as the conclusion is based on "inferences drawn from documents or undisputed facts, . . . Rule 52 (a) of the Rules of Civil Procedure is applicable." *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 394

in the United States through the use of the patent, which was secured by Singer on the assurances to Gegauf and its colicensee, Vigorelli, that such would certainly be the result. See *Federal Trade Comm'n* v. *Beech-Nut Packing Co., supra.* Singer cannot, of course, contend that it sought the assignment of the patent merely to assure that it could produce and sell its machines, since the preceding cross-license agreement had assured that right. The fact that the enforcement plan likewise served Singer is of no consequence, the controlling factor being the overall common design, *i. e.,* to destroy the Japanese sale of infringing machines in the United States by placing the patent in Singer's hands the better to achieve this result. It is this concerted action to restrain trade, clearly established by the course of dealings, that condemns the transactions under the Sherman Act. As we said in *United States* v. *Parke, Davis & Co., supra,* at 44, "whether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used."

Moreover this overriding common design to exclude the Japanese machines in the United States is clearly illustrated by Singer's action before the United States Tariff Commission. Less than eight months after the patent was issued it started this effort to bar infringers in one sweep. As an American corporation, it was the sole company of the three that was able to bring such an action.

---

(1948). The rule was there stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.,* at 395. The evidence here, including many findings of the trial court, clearly compels the conclusion that the parties' concerted activities were motivated by a common purpose, and the court's conclusion to the contrary must be regarded as clearly erroneous. *United States* v. *United States Gypsum Co., supra;* see *Pacific Portland Cement Co.* v. *Food Mach. & Chem. Corp.,* 178 F. 2d 541 (C. A. 9th Cir. 1949).

When it appeared that the references to Pfaff in the assignment agreement threatened the success of the Tariff Commission proceeding, Gegauf consented to the deletion of Pfaff from the agreement. This maneuver was for the purpose, as the trial court found, of giving Singer " 'a better chance of prevailing before the Tariff Commission' in its efforts to exclude" infringing machines. 205 F. Supp., at 427. While the tariff application was leveled against nine European as well as the Japanese competitors, the allegations were clearly beamed at the infringing Japanese machines to which Singer attributed the destruction of all American domestic household sewing machine companies save itself. As the parties to the agreements and assignment well knew, and as the trial court itself stated, "[b]y far the largest number of infringers of the Gegauf patent and invention were the Japanese." 205 F. Supp., at 418.

It is strongly urged upon us that application of the antitrust laws in this case will have a significantly deleterious effect on Singer's position as the sole remaining domestic producer of zigzag sewing machines for household use, the market for which has been increasingly preempted by foreign manufacturers. Whether economic consequences of this character warrant relaxation of the scope of enforcement of the antitrust laws, however, is a policy matter committed to congressional or executive resolution. It is not within the province of the courts, whose function is to apply the existing law. It is well settled that "[b]eyond the limited monopoly which is granted, the arrangements by which the patent is utilized are subject to the general law," *United States* v. *Masonite Corp., supra,* at 277, and it "is equally well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent

monopoly. By aggregating patents in one control, the holder of the patents cannot escape the prohibitions of the Sherman Act." *United States* v. *Line Material Co., supra,* at 308. That Act imposes strict limitations on the concerted activities in which patent owners may lawfully engage, see *United States* v. *United States Gypsum Co.,* 333 U. S. 364 (1948); *United States* v. *Line Material Co., supra; United States* v. *National Lead Co.,* 63 F. Supp. 513, aff'd, 332 U. S. 319 (1947), and those limitations have been exceeded in this case.

The judgment of the District Court is reversed and the case is remanded for the entry of an appropriate decree in accordance with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, concurring.

There are two phases to the Government's case here: one, the conspiracy to exclude the Japanese from the market, and the other, the collusive termination of a Patent Office interference proceeding pursuant to an agreement between Singer and Gegauf to help one another to secure as broad a patent monopoly as possible, invalidity considerations notwithstanding. The Court finds a violation of § 1 of the Sherman Act in the totality of Singer's conduct, and intimates no views as to either phase of the Government's case standing alone. Since, in my view, either branch of the case is sufficient to warrant relief, I join the Court's opinion, except for footnote 1, with which I disagree.

As to the conspiracy to exclude the Japanese, there is involved, as the Court points out, more than the transfer of the patent from one competitor to another; implicit in the arrangement is Singer's undertaking to enforce the patent on behalf of both itself and Gegauf. Moreover, Singer was the dominant manufacturer in the American sewing machine industry and was acquiring a patent

which dominated the multicam field, an aspect of this case which in itself raises serious questions, in my view, and which is saved by the Court for future consideration. See p. 189, *supra*.

More must be said about the interference settlement. In 1956, Singer's "Harris" multicam zigzag reissue-patent application was pending in the United States Patent Office; Gegauf had an application pending at the same time covering substantially the same subject matter, but enjoying a nine-day earlier priority date. See 35 U. S. C. § 119. In the circumstances, it appeared to Singer that, between Singer and Gegauf, Gegauf would have a better claim to a patent on the multicam zigzag, at least on the broad and thus more valuable claims. But it was by no means certain that either of them would get the patent. In cases where several applicants claim the same subject matter, the Patent Office declares an "interference." This is an adversary proceeding between the rival applicants, primarily for the purpose of determining relative priority. But a party to an interference also can, by drawing additional prior art to the attention of the Patent Office which will require the Office to issue no patent at all to anyone, see 37 CFR §§ 1.232, 1.237 (a); cf. 35 U. S. C. §§ 101–102, prevent his rival from securing a patent which if granted might exclude him from the manufacture of the subject matter. 35 U. S. C. § 154. Gegauf, after Singer approached it to negotiate an agreement before the Office declared an interference, feared that Singer might in self-defense draw to the attention of the Patent Office certain earlier patents the Office was unaware of, and which might cause the Gegauf claims to be limited or invalidated; Singer "let them know that we thought we could knock out their claims but that in so doing we were probably going to hurt both of us."

The result was that in April 1956 Singer and Gegauf entered a general cross-licensing agreement providing that

the parties were not to attack one another's patent applications "directly or indirectly;" not to do anything to restrict one another's claims in patents or applications, and to facilitate the allowance to one another of "claims as broad as possible." In August 1956 the Patent Office declared the anticipated interference. Singer and Gegauf settled the interference pursuant to their prior agreement: Singer withdrew its interfering claims and in April 1957 the Patent Office dissolved the interference proceeding before it had ever reached the litigation stage. 37 CFR § 1.262. Eventually the Gegauf patent issued and was sold to Singer as part of the concerted action to exclude the Japanese which is involved in the first branch of the case, *supra,* p. 197.

In itself the desire to secure broad claims in a patent may well be unexceptionable—when purely unilateral action is involved. And the settlement of an interference in which the only interests at stake are those of the adversaries, as in the case of a dispute over relative priority only and where possible invalidity, because of known prior art, is not involved, may well be consistent with the general policy favoring settlement of litigation. But the present case involves a less innocuous setting. Singer and Gegauf agreed to settle an interference, at least in part, to prevent an open fight over validity. There is a public interest here, see *Mercoid Corp.* v. *Mid-Continent Co.,* 320 U. S. 661, 665; *United States* v. *Masonite Corp.,* 316 U. S. 265, 278, which the parties have subordinated to their private ends—the public interest in granting patent monopolies only when the progress of the useful arts and of science will be furthered because as the consideration for its grant the public is given a novel and useful invention. U. S. Const., Art. I, § 8; 35 U. S. C. § 101; Statute of Monopolies, 21 Jac. I, c. 3. When there is no novelty and the public parts with the monopoly grant for no return, the public has been imposed upon

and the patent clause subverted. *United States* v. *Bell Telephone Co.*, 128 U. S. 315, 357, 370; see *Katzinger Co.* v. *Chicago Mfg. Co.*, 329 U. S. 394, 400–401; *Cuno Corp.* v. *Automatic Devices Corp.*, 314 U. S. 84, 92; *A. & P. Tea Co.* v. *Supermarket Corp.*, 340 U. S. 147, 154–155 (concurring opinion). Whatever may be the duty of a single party to draw the prior art to the Office's attention, see 35 U. S. C. § 115; 37 CFR § 1.65 (a); *Bell Telephone, supra,* at 356, clearly collusion among applicants to prevent prior art from coming to or being drawn to the Office's attention is an inequitable imposition on the Office and on the public. *Precision Instrument Co.* v. *Automotive Co.*, 324 U. S. 806; see H. R. Rep. No. 1983, 87th Cong., 2d Sess. 1, 4 (Rep. on Act of October 15, 1962, Pub. L. 87–831, 76 Stat. 958). In my view, such collusion to secure a monopoly grant runs afoul of the Sherman Act's prohibitions against conspiracies in restraint of trade*—if not bad *per se,* then such agreements are at least presumptively bad. Compare *Mitchel* v. *Reynolds,* 1 P. Wms. 181, 191–192, 24 Eng. Rep. 347, 350–351. The patent laws do not authorize, and the Sherman Act does not permit, such agreements between business rivals to encroach upon the public domain and usurp it to themselves.

---

*The Court has already held similar agreements contrary to public policy and unenforceable. In the "patent estoppel" cases, the Court found that public policy favors the exposure of invalid patent monopolies before the courts in order to free the public from their effects. Thus a licensee may not be prevented from attacking the validity of his licensor's patent. *Sola Elec. Co.* v. *Jefferson Elec. Co.,* 317 U. S. 173; *Scott Paper Co.* v. *Marcalus Mfg. Co.,* 326 U. S. 249; *Katzinger Co.* v. *Chicago Mfg. Co.,* 329 U. S. 394; *MacGregor* v. *Westinghouse Co.,* 329 U. S. 402; *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 387–388.

It should be noted that the present agreement involved a specific promise not to attack one another's patents directly or indirectly in addition to a promise to cooperate in interference proceedings.

MR. JUSTICE HARLAN, dissenting.

Although the Court reverses this case on the ground that the District Court proceeded on erroneous legal premises, I do not believe its opinion can serve to obscure the fact that what the majority has really done is overturn the lower court's findings of fact.

A mere reading of the exhaustive opinion below will show that the District Court in dismissing the Government's case did not, as this Court now holds, fail to recognize that a concerted use by Singer and Gegauf of their patents in pursuit of a common purpose to thwart Japanese competition would violate the Sherman Act. Rather the District Court found that such a violation had not been made out.

The basic predicate for this Court's attributing to the District Court the following of an erroneous legal standard is the "direct conflict" which the majority sees between the lower court's finding that Singer's underlying, "dominont and sole purpose" in entering into the Gegauf license agreement "was to settle the conflict" between the Harris and the Gegauf patents and the finding that Singer's "secondary" purpose was its desire to obtain "protection against the Japanese machines" which might be made under the Gegauf patent (ante, p. 190). This is indeed a slender reed for the Court's position. For one is left at a loss to understand how the two findings can be deemed inconsistent. Obviously Singer wanted to settle the "priority" issue with Gegauf in order to have solid patent protection against all comers—particularly of course the Japanese, whose ability to manufacture these popular machines in a cheap labor market put them in the forefront of possible infringers. Thus it seems to me that the findings as to Singer's "dominant" and "secondary" purposes are entirely con-

sistent, and that their supposed inconsistency can be made to rest on nothing more substantial than a play on the word "sole" in the basic finding. The further circumstance that it was only Singer's "secondary" pur-· pose that was disclosed to Gegauf goes not to the question of "consistency" but rather to the sufficiency of the lower court's ultimate finding that no illegal concert of action had been shown between Singer and Gegauf.

Nor does anything to which the Court points in the Gegauf patent assignment and Tariff Commission episodes (*ante,* pp. 191–196) lend support to this transparent effort to ground reversal on a question of law so as to escape the necessity of coming to grips with the only true issue in this case: are the District Court's findings of fact—which if accepted would put an end to the Government's case— "clearly erroneous"? Again the various bits and pieces which the Court has culled from this lengthy record go ·not to the consistency but to the sufficiency of the findings.

In my opinion the District Court's findings are invulnerable to attack under Rule 52 (a) of the Federal Rules of Civil Procedure. The mere fact that one· or more of the members of this Court might have made opposite findings if sitting at *nisi prius* does not of course serve to justify reversal of a District Court's findings under the "clearly erroneous" rule. *United States* v. *Yellow Cab Co.,* 338 U. S. 338, 341–342.

In conclusion, it is gratifying to observe the Court's recognition of the fact that the requirement of ·direct review in cases like this has become an anachronism in light of the modern work load of· this Court. *Ante,* note 1; see also the separate opinion of this writer in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 357, 364–365. The final outcome of this case might indeed have been different had this Court had "the valuable assistance of the Courts of Appeals" (*ante,* note 1).

I would affirm the judgment of the District Court.,