**UNITED STATES of America**
v.
**The SINGER MANUFACTURING CO., Defendant.**

United States District Court
S. D. New York.
June 1, 1964.

—◆—

John J. Galgay, John D. Swartz, William J. Elkins, Edward F. Corcoran, James J. Farrell, Howard Breindel and Les J. Weinstein, Attys., Department of Justice, for the Government.

Winthrop, Stimson, Putnam & Roberts, New York City, Arthur E. Pettit, Edwin J. Wesely, Edward A. Miller, and Charles A. Williams, Jr., New York City, of counsel, for defendant.

RYAN, Chief Judge.

The Supreme Court has remanded this suit for the entry of an appropriate decree in accordance with its opinion, 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823. The parties have agreed on various provisions of the proposed judgment; this opinion is limited to the principal matters remaining in dispute. These are the patents which are to be brought within the decree and the form of restrictions to be imposed.

The Government's proposed judgment would enjoin the defendant from enforcing all five patents [1] which it urges were the subject of the conspiracy; the defendant would limit the decree to one patent alone [2]—the only patent which it urges was involved in the conspiracy and to compulsory licensing at a reasonable royalty.

The position of the Government is that inasmuch as the Supreme Court found a conspiracy which related to household zigzag sewing machines, the relief should follow that product and the defendant "should not be permitted to effectuate any part of the conspiracy by virtue of any of the five patents which it has," and which it has so misused. In the face of such misuse, the Government argues, whether or not the patents were lawfully acquired is immaterial, since they were employed to achieve an unlawful end. Answering Singer's position, the Government urges that the acquisition of "Gegauf I" was but one of the overt acts of the overall conspiracy which embraced all five patents, and that to grant relief only against the one patent is to leave the defendant free to employ the other four patents to accomplish the unlawful exclusion.

Defendant's argument is that the conspiracy found was to acquire but one patent—Gegauf I—to accomplish the unlawful exclusion and that this is the only patent which should be brought within the decree since the other patents —Harris Re-Issue, Johnson and Perla— were acquired apart from the conspiracy.

The Government's theory is predicated on conspiracy directed to a particular type machine and defendant's theory is that it was a conspiracy directed to one patent.

The Supreme Court made no new findings of fact and we must assume it did

---

1.  (1) Gegauf Patent I, or Patent No. 2,- 832,302 issued April 29, 1958;

    (2) Harris Reissue Patent, or Reissue Patent No. 24,370 issued October 8, 1957 based upon the original Harris Patent No. 2,693,778 issued November 9, 1954;

    (3) Johnson Patent, or Patent No. 2,- 862,468 issued December 2, 1958;

    (4) Perla Patent, or Patent No. 2,810.- 360 issued October 22, 1957;

    (5) Gegauf Patent II, or Patent No. 2,877,726 issued March 17, 1959.

2.  Gegauf Patent I, or Patent No. 2,832,- 302 issued April 29, 1958.

adopt the findings of this Court save only those which it rejected or modified.[3]

The Supreme Court in its opinion summarized the complaint as charging, that Singer combined and conspired with two competitors, Gegauf and Vigorelli to restrain the importation, sale and distribution of household zigzag sewing machines. In our opinion, we further described the unlawful acts as contended by the Government: that Singer unlawfully acquired Gegauf I and II pursuant to the conspiracy, with the purpose of using them in conjunction with Harris (Re-issue), Johnson and Perla to exclude competition; and that there were 5 U. S. patents and 1 patent application "relevant to the wrongful acts charged."

The Supreme Court concluded that there was a conspiracy to exclude Japanese competitors in household zigzag sewing machines. The language is quite explicit; a conspiracy directed against the product, and nowhere is the product further limited or restricted by the words "embodying the Gegauf I mechanism". The Supreme Court's further statement expressly negates any such limitation when it describes the commerce concerned as the "machine carried multicam zigzag machine"; and states that "While the multicam machines involved here function in slightly different ways, all are a variant of the same basic principle," and sets forth statistics of sales and imports of all multicam machines and Singer's relative position in that market. (374 U.S. p. 176, 83 S.Ct. p. 1775.)

The Supreme Court specifically observed that what was not involved was the acquisition of a patent in order to exclude competitors but rather a series of transactions with Gegauf and Vigorelli for an illegal purpose, i. e. to rid itself and Gegauf, together, perhaps with Vigorelli, of infringements by their common competitors the Japanese manufacturers. The Supreme Court concluded that the entire course of dealings between the parties established a conspiracy, and found "a violation * * * in the totality of Singer's conduct." (374 U.S. p. 197, 83 S.Ct. p. 1785.)

This totality of conduct as charged by the Government consisted of: the cross license agreements with Gegauf and Vigorelli; the agreements assigning the two Gegauf patent applications to Singer; the agreement with Vigorelli and Gegauf permitting certain European manufacturers to import machines; and the filing of infringement suits against Japanese competitors, in two of which it obtained consent decrees (since vacated by consent) and the institution of Tariff Commission Proceedings to exclude primarily Japanese importers.

The patents played varying roles of importance in the execution of the conspiracy. Gegauf I and II were unlawfully acquired by Singer as a direct result of the conspiracy. Inextricably entwined in Gegauf acquisition was Harris reissue; although lawfully acquired this was the patent application owned by Singer which was placed under a cloud by the Gegauf application. This, the Supreme Court concluded was the "lever" and one of the "strong points" which Singer used to secure a license from Gegauf. This was the patent application which was declared in interference by the Patent Office with Gegauf I and which was settled by defendant's abandoning its interference pursuant to the license agreement with Gegauf. It was from this application after the interference was settled that the "Gegauf claim was taken verbatim," (374 U.S. p. 185, 83 S.Ct. 1773). It was the withdrawal of interference of this application which facilitated the issuance of the Gegauf patent with claims "as broad as possible" (374 U.S. p. 190, 83 S.Ct. 1773) "the more effectively to stifle competition." (374 U.S. p. 190, 83 S.Ct. p. 1782.)

---

3. The Supreme Court rejected this court's finding that the "sole" purpose of the license agreement between Singer and Gegauf was to settle the conflict in priority (374 U.S. p. 192, 83 S.Ct. 1773) and the finding that the parties were not acting with a common purpose (Rule 52(a), 374 U.S. p. 194, n. 8, 83 S.Ct. 1773.

It was the patent which Singer licensed to Gegauf under its cross licensing agreement—which the Supreme Court concluded established, among other dealings, a conspiracy in violation of the Sherman Act. (374 U.S. p. 190, footnote 7, 83 S.Ct. 1773.)

This leaves the Johnson and Perla patents, also lawfully acquired as the result of Singer's industry and which were the subject matter of the license with Vigorelli—one of the co-conspirators.[4] The existence of Johnson and Perla was generally if not specifically known to Gegauf when Singer and Gegauf agreed and understood, as it has now been concluded, that Singer was to enforce all its patents for the protection of the three—Gegauf, Vigorelli and Singer. These were the patents which Singer intended to and did use in conjunction with the illegally acquired Gegauf patents to exclude Japanese competition. In addition, the Johnson patent, along with Harris and Gegauf, was asserted in the infringement suits against the Japanese importers. Singer v. Gilbert, et al., C.A. No. AC–241, U.S.D.C., E.D.S.C.1963 and Singer v. Brother International, Civ. 141–237, U.S.D.C., S.D.N.Y.1958.

This Court's finding that Singer felt that Gegauf's patents standing alone did not have much value but that *with others* which Singer owned they assumed greater worth, in conjunction with the conclusion that there was a conspiracy leaves little doubt as to their importance in achieving the unlawful end.[5] It was this use, to further the purpose of the conspiracy which must bring them within the decree.

In support of its proposed judgment enjoining enforcement of these five patents, the Government argues that since the offense established was the acquisition and pooling of patents in order to assert them against competitors, the only effective means of freeing these competitors from Singer's unlawful exclusion is to deprive Singer of the benefits it derives from the patents. It argues that there is a distinction between this type violation which lies in the enforcement of the patent itself, and that which was found in United States v. Imperial Chemical Industries, Ltd., 105 F.Supp. 215, which consisted of territorial allocations through restrictive licensing. The Government contends that while compulsory licensing in the second situation cures the evil effect of the violation by opening up territory to competition formerly closed to it, licensing in the first case does nothing but reward the defendant and permit it to continue the exclusion. Whatever the logic there may be in this argument (and it must be admitted that it is not entirely devoid of some rational basis), the Supreme Court has to date refused to approve either royalty-free licensing or non-enforcement of patents.

Reaffirming the teaching of Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, that in a private infringement suit a patent owner may be precluded from enforcing his patent if he is guilty of violating the anti-trust laws, Mr. Justice Roberts in Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945) questioned the power of the Court in framing an anti-trust decree to order forfeiture of a patent, and reversed the district court which had so decreed. The principle underlying the decision was that since validity of the patents was not attacked their enforcement should not be restrained because it was an interference with the property right

---

4. The Court found that there was a shadow cast upon the negotiations with Vigorelli because of a letter of Singer's president wherein he discussed the advantage to the two of them by "pooling" their respective positions in order to "strengthen and broaden the patent situation." (374 U.S. p. 177, 83 S.Ct. p. 1775, footnote 2.)

5. Even Mr. Justice Harlan's dissenting opinion states the violation found by the majority as a "concerted use * * * of their *patents* in pursuit of a common purpose." (374 U.S. p. 201, 83 S.Ct. p. 1787.)

of the patent. The dissent supported the Government's position that the patents were not only the weapons of the conspiracy but its fruits, and that to restore competition it was necessary to decree royalty-free licensing. But, and this seems significant to us, even there the dissent thought that the requirement of royalty-free licensing would have presented "greater difficulty if the violation had not been so gross and so long continued." (323 U.S. p. 450, 65 S.Ct. p. 403.) The reason for the Court's dissent was the fact that defendant had amassed so many patents (over 600, embracing 94 per cent of the trade) that it was impossible to separate those lawfully acquired from those unlawfully acquired and that the trial court was justified in decreeing royalty-free licensing as to all. However, the dissent tempered its conclusion by recognizing that there might be cases where the patent owner would be able to separate his violation and its continuing effects from further assertion of his patent rights and thus become entitled to some form of relief which would permit him to so assert them. In any event, the majority opinion of the Court equated compulsory royalty-free licensing with forfeiture of the patents, and in the face of the magnitude of the violation which in addition to a restraint of trade also included a monopoly, refused to affirm the decree of the lower court.

In United States v. National Lead Co., 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077, decided two years later, a restraint of trade and a monopoly case also, the Court again refused to direct either royalty-free compulsory licensing as first prayed for by the Government, or to enjoin their enforcement as was later sought. Here, again, the Court discussed both remedies interchangeably characterizing both as a "forfeiture" and declined to order either although the defendants were described as "giants of the industry" who had pooled invalid patents with valid patents, making it im-

possible to segregate them, and whose illegal conduct had been going on for 25 years! The dissent again stated that where there has been unlawful acquisition and patents so "flagrantly misused" defendant should not receive royalties. Although in theory there is similarity between the dissent and the Government's position here, the two cases are not comparable.

Finally, we are cited Judge Forman's decision in United States v. General Electric Co., 115 F.Supp. 835, D.C.N.J.1953, decreeing public dedication of certain patents. There again there was present a monopoly, as well as a restraint of trade and as pointed out by the Court, that was the distinction between that case and the I. C. I. case, supra, and the reason for the need to order dedication. The Court felt that defendant's position over the market was so strong by reason of its monopoly that a compulsory license would serve no purpose since it would not provide sufficient encouragement to competition—which at the time was nonexistent. However, where there were manufacturers adequately equipped to produce machinery if they had access to patents the Court did decree compulsory licensing rather than forfeiture. This aspect of the case is clearly comparable to the suit now before us.

The test there applied and that which runs through the majority opinions and dissents in the Hartford-Empire and National Lead cases and the only one which must guide the Court in framing an anti-trust decree is what measure must be applied in order to dispel the evil effect of the defendant's wrongful conduct—which means what will restore competition.

The parties are directed to submit on thirty (30) days' notice an appropriate decree in accordance with this opinion, including in the decree reasonable royalty licensing, and inspection and reporting provisions similar to those applied by this Court in I. C. I.