WESTERN ELECTRIC COMPANY, INCORPORATED, Plaintiff,

v.

PIEZO TECHNOLOGY, INC., Defendant–Appellee,

v.

Donald QUIGG, Assistant Secretary and Commissioner of Patents and Trademarks, Appellant.

No. 88–1216.

United States Court of Appeals, Federal Circuit.

Nov. 1, 1988.

Jacob M. Lewis of the Civil Div., Dept. of Justice, Washington, D.C., argued for appellant. With him on the brief were John R. Bolton, Asst. Atty. Gen., Washington, D.C., Henry H. Hudson, U.S. Atty., Alexandria, Va., and John F. Cordes, Washington, D.C. Of counsel were Fred E. McKelvey, Sol., and John W. Dewhirst, Associate Sol., U.S. Patent & Trademark Office, Arlington, Va.

Gordon D. Coplein of Darby & Darby, New York City, argued for defendant-appellee. With him on the brief was Peter C. Schechter of Darby & Darby, New York City. Of counsel was Steven E. Lipman, of Lupo, Lipman & Lever, Washington, D.C.

Before ARCHER, Circuit Judge, BALDWIN, Senior Circuit Judge, and MAYER, Circuit Judge.

ARCHER, Circuit Judge.

Donald Quigg, Assistant Secretary and Commissioner of Patents and Trademarks (Commissioner), appeals from an order of the United States District Court for the Eastern District of Virginia holding the Commissioner in civil contempt for prohibiting a patent examiner from answering certain deposition questions posed by Piezo Technology, Inc. (Piezo), the defendant in a private patent infringement suit. We reverse.

## Background

Western Electric Company, Incorporated (Western Electric) sued Piezo for infringement of U.S. Patent No. 3,564,463 ('463) in the Middle District of Florida. At issue are monolithic dual resonator devices manufactured by Piezo. During the course of the infringement suit a reexamination of the patent was conducted.[1] Piezo then added a defense of inequitable conduct during the reexamination proceeding to the patent infringement suit. Piezo noticed the deposition of Marvin L. Nussbaum, the patent examiner assigned to the reexamination, to be taken at the office of the Solicitor of the United States Patent and Trademark Office (PTO), which is located in the Eastern District of Virginia.

During the deposition the associate solicitor for the PTO objected to certain questions asked of Examiner Nussbaum and eventually instructed the Examiner not to answer certain questions. Piezo proceeded question by question to make a record of the questions for which answers were desired.[2]

Piezo moved the United States District Court for the Eastern District of Virginia for an order compelling Examiner Nussbaum to answer questions seeking to "determine the prior art knowledge of the Patent Office at the time of the issuance [of the reexamination certificate] and the facts upon which the examiner's decision was based." The district court granted Piezo's motion to compel, noting from the bench that the relevant caselaw permitted Piezo to "inquire into the facts but not into the thought processes." The Commissioner moved for reconsideration. This motion was denied. The court stated orally that "the questions advanced sought to reveal the examiner's technical knowledge of prior art not the examiner's mental processes and were therefore proper under *Standard*

---

1. Claims 3–8 and 10–11 of the Western Electric patent were reexamined. All but claim 3 were found patentable on reexamination.

2. A list of questions representative of those asked is appended hereto.

*Packing Corp. v. Curwood,* [sic] [365 F.Supp. 134, 180 USPQ 235 (N.D.Ill.1973)] ... and *In Re Mayewsky,* [sic] [162 USPQ 86, 89 (E.D.Va.1969)]." The court thereupon ruled that Examiner Nussbaum must answer the rephrased questions "exactly as to his technical knowledge of [the] prior art and not the examiner's mental processes."

When Examiner Nussbaum's deposition resumed he was instructed by the associate solicitor for the PTO not to answer a total of 58 questions. Piezo then moved for an order of civil contempt against the Commissioner, in response to which the court ordered Examiner Nussbaum to answer the questions. The court required the Commissioner to inform Piezo whether Examiner Nussbaum would answer the questions. The Commissioner informed Piezo that he had directed the Examiner not to answer the questions and Piezo renewed its motion for contempt.

The district court entered an order holding Examiner Nussbaum in civil contempt for violating its previous directives to answer the questions. This order was later modified to hold the Commissioner in contempt rather than Examiner Nussbaum and imposed a fine of $300, which was stayed pending appeal.

### Contentions of the Parties

The Commissioner contends that Piezo's questions are not limited to "questions of fact" but instead "go into hypothetical or speculative areas or the bases, reasons, mental processes, analyses or conclusions" for the examiner's decision. The Commissioner in his brief states that "[v]irtually all of the questions sought to ascertain the examiner's knowledge at the time of the reexamination, or that of the PTO, of various aspects of crystal filter technology." Such questions, according to the Commissioner, violate the rule set out in *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941). The Commissioner also considers Piezo's questions as an attempt to attack Examiner Nussbaum's reexamination decision indirectly by challenging his knowledge of crystal filter technology. Lastly, the Commissioner argues that Piezo's questions are irrelevant to its inequitable conduct defense. A patent applicant has a duty under 37 C.F.R. § 1.56(a) to disclose information only insofar as it would have been material to a "reasonable examiner." Because this is an objective standard, the expertise of Examiner Nussbaum, according to the Commissioner, is irrelevant to the issue of inequitable conduct.

Piezo urges that its questioning of the examiner was only for factual information and that it did not seek to attack the decision on reexamination. As to the relevancy of the inquiries Piezo notes that Western Electric claimed in the trial court that inequitable conduct could not have occurred because the examiner was an independent and impartial "expert" who could recognize inaccurate or misleading statements about prior art. Piezo contends that because of Western Electric's stated position in the trial court its questions were permissible. According to Piezo, "The factual question before the trial court is whether, as Western contends, the Examiner has the prior art knowledge of an expert in the technological field."

### ISSUE

Whether a patent examiner may be compelled to answer questions during a deposition which probe the examiner's technical knowledge of the subject matter of the patent?

### OPINION

■ A district court's decision in a discovery matter is reviewable only to determine whether that court abused its discretion. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Adkins v. United States,* 816 F.2d 1580, 1581–82 (Fed.Cir.1987). An abuse of discretion may be found when (1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based on an erroneous conclusion of the law; (3) the district court's findings are clearly erroneous; or (4) the record contains no evidence upon which the district court ration-

ally could have based its decision. *Heat and Control, Inc. v. Hester Industries, Inc.,* 785 F.2d 1017, 1022, 228 USPQ 926, 930 (Fed.Cir.1986); *PPG Indus., Inc. v. Celanese Polymer Specialties Co.,* 840 F.2d 1565, 1567, 6 USPQ2d 1010, 1013 (Fed.Cir. 1988) ("In determining if the district court abused its discretion ... the principles guiding this court are whether the district court's decision was based on an erroneous conclusion of law or clearly erroneous factual findings, or whether the district court committed a clear error of judgment."). A district court's determination of the law and the application thereof to the facts is not a matter within the trial court's discretion. *United States v. Singer Mfg. Co.,* 374 U.S. 174, 193, 83 S.Ct. 1773, 1783, 10 L.Ed.2d 823, 137 USPQ 808, 815 (1963).

█ In this case the district court erred in misconstruing and misapplying the Supreme Court's decision in *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). In *Morgan,* an order of the Secretary of Agriculture setting rates at the Kansas City Stockyards under the Packers and Stockyards Act was challenged. *Id.* at 413, 61 S.Ct. at 1000. Plaintiffs in that case were permitted by the district court to take the deposition of the Secretary and to question him "at length" during the trial "regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates." *Id.* at 422, 61 S.Ct. at 1004. The Supreme Court held that "the short of the business is that the Secretary should never have been subjected to this examination." *Id.* The Court explained that the "proceeding before the Secretary 'has a quality resembling that of a judicial proceeding.' *Morgan v. United States,* 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288. Such an examination of a judge would be destructive of judicial responsibility.... Just as a judge cannot be subjected to such scrutiny, ... so the integrity of the administrative process must be equally respected." *Id. Morgan* does not, however, expressly prohibit such an official, exercising a quasi-judicial function, from being compelled to testify as to relevant matters of fact as long as the factual matters do not probe into the mental processes employed in formulating the decision in question.

This court applied the *Morgan* rule in *Bacon v. Department of Housing & Urban Dev.,* 757 F.2d 265, 269–70 (Fed.Cir. 1985), in which we held that a court could not look behind the Secretary of HUD's stated purpose for a reduction-in-force. One of our predecessor courts (whose precedent is binding, *South Corp. v. United States,* 690 F.2d 1368, 1371, 215 USPQ 657, 658 (Fed.Cir.1982) (*en banc*)) applied this rule in holding that a party challenging the settlement of dumping cases could not inquire into the mental processes of the Secretary of Commerce in approving the settlement. *Montgomery Ward & Co. v. Zenith Radio Corp.,* 673 F.2d 1254, 1263–64 (CCPA), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). This court has not, however, previously addressed the extent to which a patent examiner can be compelled to testify with respect to the reexamination of a patent.

Patent examiners are quasi-judicial officials. *Butterworth v. United States ex rel. Hoe,* 112 U.S. 50, 67, 5 S.Ct. 25, 39, 28 L.Ed. 656 (1884) ("That it was intended that the Commissioner of Patents, in issuing or withholding patents ... should exercise quasi-judicial functions, is apparent from the nature of the examinations and decision he is required to make."); *United States v. American Bell Tel. Co.,* 128 U.S. 315, 363, 9 S.Ct. 90, 95, 32 L.Ed.2d 450 (1888) ("The patent ... is the result of a course of proceeding, quasi-judicial in its character."); *Chamberlin v. Isen,* 779 F.2d 522, 524, 228 USPQ 369, 371 (9th Cir.1985) ("[I]t has long been recognized that PTO employees perform a 'quasi-judicial' function in examining patent applications."); *see Compagnie de Saint–Gobain v. Brenner,* 386 F.2d 985, 987, 155 USPQ 417, 419 (D.C.Cir. 1967). And the general rule has been that a patent examiner cannot be compelled to testify regarding his "mental processes" in reaching a decision on a patent application. *Fischer & Porter Co. v. Corning Glass Works,* 61 F.R.D. 321, 322, 181 USPQ 329,

329 (E.D.Pa.1974); *Monsanto Co. v. Dawson Chemical Co.*, 176 USPQ 349, 349 (E.D.Va.1972); *Shaffer Tool Works v. Joy Mfg. Co.*, 167 USPQ 170, 170 (S.D.Tex. 1970), *later proceeding*, 175 USPQ 613, 614 (S.D.Tex.1972); *In re Mayewsky*, 162 USPQ 86, 89 (E.D.Va.1969). *See also American Cyanamid v. F.T.C.*, 363 F.2d 757, 778–79, 150 USPQ 135, 150–51 (6th Cir.1966), *later proceeding*, 401 F.2d 574 (6th Cir.1968). The courts have held, however, that patent examiners may be deposed if the questions are limited to factual matters and if the questioning does not delve into "hypothetical or speculative areas" or the examiner's "bases, reasons, mental processes, analyses or conclusions." *Shaffer Tool Works*, 167 USPQ at 171; *accord Fischer & Porter Co. v. Corning Glass Works*, 61 F.R.D. at 322, 181 USPQ at 329; *Standard Packing Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 136, 180 USPQ 235, 236 (N.D.Ill.1973); *Monsanto Co.*, 176 USPQ at 349; *In re Mayewsky*, 162 USPQ at 89; *see also* Manual of Patent Examining Procedure § 1701.01; Lupo, *The Impact of In re Mayewsky: What Should An Examiner Be Allowed To Testify To?*, 55 J.Pat.Off.Soc'y 216 (1973).

The questioning at issue in this case sought to ascertain the knowledge of Examiner Nussbaum and the Patent Office, which also, directly or indirectly, necessarily disclosed the knowledge of Examiner Nussbaum himself. For example, question number 11 was: "At the time of re-examination, was the Patent Office aware of a characteristic with respect to quartz resonators known as the capacitance ratio?" Similarly, question number 29 asked: "Mr. Nussbaum, at the time of re-examination, did you have any independent knowledge of your own as to the meaning in the prior art of a narrow band filter?"

While the questions posed to Examiner Nussbaum may in form be deemed to satisfy the first portion of the above test, i.e., they are limited to factual matters, we are satisfied they fail the second portion, which prohibits inquiry into hypothetical areas or matters relevant to the examiner's thought process in arriving at a decision. Thus, even though the questions were factual in form, they were not asked to obtain technical information or facts relating to the conduct of the reexamination proceeding; rather, the questioning sought only to determine the extent of the examiner's knowledge in the particular art. Questions directed at scoping out the bounds of the examiner's technical knowledge may indicate, either separately or as a group, the considerations or factors which he took into account during the reexamination process.

The examiner's knowledge of the relevant prior art is, to a large part, the product of his consideration of the references before him. Later recollection by the examiner of what he knew at the time of the reexamination proceeding may be indicative of technical areas or prior art he deemed important, while unimportant matters may be forgotten. The state of an examiner's knowledge is, therefore, inextricably intertwined with his reasoning and his action in reexamining the patent. Disclosure of the details of the examiner's technical knowledge inherently provides at least some, and more likely substantial, insight into his mental processes in evaluating the application and pertinent references. For these reasons, the line of questioning at issue here is objectionable under the above test.

Piezo argues that the questions are proper under *Standard Packaging Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 180 USPQ 235 (N.D.Ill.1973). In that case, questions were permitted that "seek to determine the prior art knowledge of the Patent Office at the time of issuance and the facts upon which the examiner's decision was based." 365 F.Supp. at 136–37, 180 USPQ at 236. We are not convinced that *Standard Packaging* was correctly decided under *Morgan, supra*, and therefore find it unpersuasive. In any event, *Standard Packaging* is inapposite because the court determined that the "inquiries are relevant to the issue of 'obviousness.'" 365 F.Supp. at 137, 180 USPQ at 236. At issue here is inequitable conduct, not obviousness.

We find that the questions to Examiner Nussbaum are objectionable for a second reason. They tend to be disruptive of the decisionmaking process and thereby inter-

fere with the PTO's administrative functions. By asking these questions in anticipation that the examiner does not know the answers or is not fully conversant with the technical area, a party could attempt to discredit the examiner and ease its burden of persuasion. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050, 5 USPQ2d 1434, 1438 (Fed.Cir.1988) ("A patent is presumed valid and the burden of establishing invalidity rests on the party asserting such invalidity.") Accordingly, the concerns expressed in *Morgan* are relevant here. The Supreme Court noted that questioning of a judge would be "destructive of judicial responsibility" and that "the integrity of the administrative process must be equally respected." *Morgan*, 313 U.S. at 422, 61 S.Ct. at 1004–05. Patent examiners are quasi-judicial officials. *Butterworth*, 112 U.S. at 67, 5 S.Ct. at 39. It is no more appropriate to question a patent examiner's technical expertise than it is to question the quality of a judge's law school education or judicial experience. Furthermore, questions that might discredit an examiner are irrelevant because it is not the particular examiner's expertise that gives the decisions presumptive correctness but the authority duly vested in him by his appointment as a patent examiner.

Piezo contends lastly that the questions were relevant and permissible to support its inequitable conduct defense. In attempting to refute this defense, Western Electric contended to the trial court that the examiner was an independent and impartial expert who could recognize inaccurate or misleading statements about the prior art. Western Electric's contention, according to Piezo, raises a question of fact as to the extent of the examiner's knowledge of the prior art at the time of the reexamination proceeding. Western Electric's contention in the trial court, however, is legally untenable.

A determination of inequitable conduct requires findings of materiality and intent. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415, 5 USPQ2d 1112, 1115 (Fed.Cir. 1987). Information is material where "there is a substantial likelihood that a reasonable examiner would consider it im-portant in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a); *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1481, 1 USPQ2d 1241, 1247 (Fed.Cir.1986). The standard to be applied is not whether a particular examiner would consider the material to be important, or in this case whether he would be misled by alleged misrepresentations; rather it is that of a "reasonable examiner." Inquiry into the importance that Examiner Nussbaum may have placed on the representations, i.e., by testing his knowledge of prior art, is therefore wholly irrelevant. There can be no basis for allowing discovery of a patent examiner to rebut a contention which is legally erroneous.

Piezo makes much of the fact the proceedings in the PTO are essentially ex parte. Because there is no adversary, according to Piezo the examiner must assume that the applicant's presentation is truthful and therefore Piezo's questions must be permitted "to achieve even a minimal level of fairness."

These arguments are unpersuasive. It is permissible under *Morgan* and its progeny to determine from an examiner whether a party had submitted certain information, or whether specific prior art was before the examiner. In such a case, because there is no adversary, it would be difficult to resolve these facts without testimony of an examiner. Here the questioning went much further, probing the examiner's knowledge and thought processes. The ex parte nature of the proceeding does not justify questioning an examiner for such purposes.

Accordingly, we hold that the district court abused its discretion in compelling Examiner Nussbaum to answer questions directed at his knowledge of the prior art and his expertise in a particular technology. The order of the district court holding the Commissioner in contempt for prohibiting the patent examiner from answering such questions is reversed.

REVERSED.

APPENDIX

Q–2. Was the knowledge of the Patent Office regarding the prior art documents which you reviewed in connection with the re-examination consistent with the presentation made by the patent owner regarding those prior art references?

Q–4. At the time of re-examination, did the Patent Office know that the prior art included something called a quartz resonator?

Q–6. At the time of re-examination, did the Patent Office know that quartz resonators were commonly described in the prior art in terms of an equivalent electrical circuit?

Q–7. At the time of re-examination, did the Patent Office know that quartz resonators were characterized in the prior art as having a resonant and anti-resonant frequency?

Q–10. Mr. Nussbaum, at the time of re-examination, was the Patent Office aware of a characteristic with respect to quartz resonators known as the capacitance ratio?

Q–12. At the time of re-examination, did the Patent Office have any knowledge as to typical—and by "typical" I mean typical in the prior art—typical values of capacitance ratios for AT-cut quartz crystals?

Q–20. At the time of re-examination, did the Patent Office know that the prior art included the use of quartz resonators as bandpass filters?

Q–22. Mr. Nussbaum, in connection with the re-examination proceeding, did you consider any prior art other than the references of record?

Q–23. Mr. Nussbaum, in connection with the re-examination, did you refer to any of your own independent knowledge? By "independent", I mean apart from the knowledge contained in the documents which were cited by the applicant or documents which you just referred to a moment ago.

Q–24. Mr. Nussbaum, at the time of re-examination, what was the knowledge of the Patent Office regarding the terminology, "narrow band, intermediate bank [sic—band], and wide band filters" as used in the prior art?

Q–29. Mr. Nussbaum, at the time of re-examination, did you have any independent knowledge of your own as to the meaning in prior art of a narrow band filter?

Q–31. At the time of re-examination, did you have any knowledge which was obtained from public documents as to the meaning in the prior art of the term narrow band crystal filter?

Q–43. Mr. Nussbaum, at the time of re-examination, did the Patent Office know that such products as are indicated in Nussbaum Deposition Exhibit 3 existed in the prior art?

Q–49. Mr. Nussbaum, at the time of re-examination, did the Patent Office know that there were technical reasons why those skilled in the art preferred to design in the narrow bank [sic—band] range as opposed to the intermediate or wide band range?

Q–55. Mr. Nussbaum, did the Patent Office ever determine whether or not Nakazawa filters which are disclosed in that paper, at least some of them, had both resonant frequencies of the lattice? The lattice I'm talking about is the lattice equivalent circuit—the lattice circuit of the resonators less than both anti-resonant frequencies?

Q–56. Did the Patent Office ever know that Nakazawa disclosed filters having resonators in which the lattice equivalent circuit had both resonator frequencies less than both anti-resonant frequencies?