**Mark C. CARTER, a California resident, and International E–Z Up, Inc., a California corporation, Plaintiffs,**

v.

**VARIFLEX, INC., a Delaware corporation, Defendant.**

**Variflex, Inc., a Delaware corporation, Counter–Complainant,**

v.

**Mark C. Carter, a California resident, International E–Z Up, Inc., a California corporation, James Lynch, a Colorado resident, and KD Kanopy, Inc., a Colorado corporation, Counter–Defendants.**

**No. CV 98–0167 WJR(RNBX).**

United States District Court, C.D. California.

Feb. 15, 2000.

---

Michael J. Kump, Kinsella Boesch Fujikawa & Towle, Los Angeles, CA, for plaintiffs.

Paul J Hall, Lillick & Charles, San Francisco, CA, Charles B Rosenberg, Mark Philip Wine, Cynthia Alison Lock, Oppenheimer Wolff & Donnelly, Los Angeles, CA, James E Hartley, David S Prince, Brian P Kinnear, Holland & Hart, Denver, CO, Rachel A Yates, Holland & Hart LLP, Greenwood Village, CO, for Variflex Inc., defendant.

Eric Keith Larson, Paul J Hall, Lillick & Charles, San Francisco, CA, Charles B Rosenberg, Mark Philip Wine, Cynthia Alison Lock, Oppenheimer Wolff & Donnelly, Los Angeles, CA, for Service Merchandise Co., Inc., defendant.

ORDER GRANTING SUMMARY JUDG-
MENT ON COUNTS V, VI, VII,
AND VIII OF COUNTERCLAIMS

REA, District Judge.

## I. Legal Standard for Summary Judgment Motion

Summary judgment is appropriate where no genuine issue of material fact exists and a party is entitled to prevail in the case as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). The party requesting summary judgment has the initial burden to show that there are no genuine issues of material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 632 (9th Cir.1987). The moving party does not necessarily need to put on evidence to negate the claim, but may simply point to portions of the pleadings, admissions, answers to interrogatories, and depositions which, along with any affidavits, show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party satisfies its initial burden, the opposing party may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists. *See* Fed.R.Civ.P. 56(e). The dispute, however, must be genuine. The "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In general, it is difficult to resolve antitrust cases on summary judgment because of their factual complexity. *See Rickards v. Canine Eye Registration Found.*, 783 F.2d 1329, 1332 (9th Cir.1986). This does not mean, however, that a district court may not award summary judgment when appropriate. *See Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991).

In fact, an appropriate award of summary judgment may save the parties and the courts from unnecessarily spending the extraordinary resources required for a full-blown antitrust trial. *See id.* The Supreme Court's decision in *Matsushita* significantly clarified the standards for resolving summary judgment cases in the antitrust arena. *See Matsushita*, 475 U.S. at 585–88, 106 S.Ct. 1348. Since that time, the Ninth Circuit has shown on numerous occasions that summary judgment on an antitrust claim may be appropriate. *See Bhan*, 929 F.2d at 1409.

## II. Application to Counterclaims

### A. Federal Antitrust Violations

Variflex alleges that Carter, E–Z Up, Lynch, and KDK engaged in a conspiracy to allocate customers and monopolize the instant canopy market by entering agreements to cross-license patents, threatening to enforce invalid patents, jointly coordinating the filing of allegedly baseless patent infringement lawsuits, and threatening Variflex's customers. Based on these acts, Variflex asserts counterclaims for conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Counterclaim Defendants argue that the Court should grant summary judgment on Variflex's federal antitrust counterclaims because Variflex has failed to make an adequate showing of antitrust injury. Alternatively, Counterclaim Defendants argue that the Court should grant summary judgment because Variflex has failed to make an adequate showing of the relevant market and Counterclaim Defendants' market power. The Court will first address the issue of relevant market and market power.

### 1. Relevant Market and Market Power

### a. Section 1 Conspiracy to Unreasonably Restrain Trade

In order to prove a Section 1 claim for conspiracy to unreasonably restrain

trade, a plaintiff must establish the existence of a conspiracy that unreasonably restrains trade and affects interstate or foreign commerce.[1] *See American Ad Management, Inc. v. GTE,* 92 F.3d 781, 788 (9th Cir.1996). Two methods of analysis exist to determine whether conduct unreasonably restrains competition: (1) the "per se" rule and (2) the "rule of reason." *See* I ABA Section of Antitrust Law, *Antitrust Law Developments* 40 (4th ed.1997). If the court applies the per se rule, the court must presume an adverse effect on competition without a study of the market or an analysis of the restraint's actual effect on competition. *See id.* If, on the other hand, the court applies the rule of reason, the court must analyze the restraint's effect on competition in a relevant market. *See id.* at 41.

i. Per se rule.

■ Variflex argues that the Court should apply the per se rule because Counterclaim Defendants agreed to allocate the market, and courts have held that market allocation agreements among competitors are per se illegal. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990). As proof of the alleged agreement to allocate the market, Variflex points primarily to the 1996 Settlement Agreement, by which Lynch granted an exclusive license to E–Z Up and relinquished any license from Carter for sales within the mass merchandise retail market,[2] and to a statement in E–Z Up's 1996 audit report that E–Z Up was able to secure the mass retail market rights of the license agreement and prevent KDK from entering the mass retail market.

However, such evidence does not warrant the inference of an agreement to allocate the market. Generally, courts have held that a patentee may "grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege" without violating the antitrust laws. *Ethyl Gas. Corp. v. United States,* 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852 (1940). Counterclaim Defendants were well within their rights to enter restrictions on sales within the mass retail market.

It is true that in some circumstances, the Supreme Court has held that a cross-licensing agreement is per se illegal because it is an integral part of an overarching scheme to allocate a market. *See United States v. Singer Mfg. Co.,* 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). In those cases, however, the Supreme Court found clear evidence on the record from the parties' own statements that the primary purpose of the cross-licensing agreements was to exclude outside competition and destroy the sale of competing goods, thus expanding their monopoly rights beyond the patent grants. *See Singer,* 374 U.S. at 195, 83 S.Ct. 1773 (finding common purpose to destroy the Japanese sale of infringing machines); *Zenith,* 395 U.S. at 118, 89 S.Ct. at 1574 (finding clear purpose to exclude American concerns from Canadian market).

Variflex has made no such showing here. Without more, Variflex has merely shown that Counterclaim Defendants entered a cross-licensing agreement with a field of use restriction. Courts analyze field of

---

1. As part of the overall conspiracy to allocate the market, Variflex alleges that the Counterclaim Defendants' filed this patent infringement action as a sham to cover an attempt to interfere with competition in the market. In addition, Variflex alleges (for the first time on summary judgment) that Counterclaim Defendants conspired to enforce patents known to be invalid and obtained through fraud on the Patent and Trademark Office. Such allega-

tions, even if proven, merely strip Counterclaim Defendants of their immunity from antitrust liability and do not relieve Variflex of the obligation to establish all other elements of its claims. *See Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed.Cir. 1998).

2. Mass merchandise retailers are national retailers with twenty or more locations.

use restrictions under the rule of reason to assess their anti-competitive effects. *See Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 708 (Fed.Cir.1992). Thus, the Court will apply the rule of reason.

ii. Rule of reason.

■ The rule of reason is the most common mode of analysis in Section 1 cases. *See* I ABA Section of Antitrust Law, *supra,* at 51. Under the rule of reason, the plaintiff must show that the restraint has had, or is likely to have, an adverse effect on competition. *See Bhan,* 929 F.2d at 1409. The plaintiff may establish an adverse effect on competition by: (1) proof of a "naked restraint," where an adverse effect on price or output is obvious, (2) proof of an actual adverse effect on competition, or (3) proof that the defendant has power in a properly defined relevant market. *See* I ABA Section of Antitrust Law, *supra,* at 56.

The Supreme Court has found a naked restraint on trade or actual anti-competitive effect where the alleged anti-competitive conduct drastically affected price and output in a localized market, such that price and output were not responsive to demand. *See e.g., NCAA v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). If the court finds that there is a naked restraint on trade or an actual adverse effect on competition, the court may apply a "quick-look" rule of reason without requiring proof of the relevant market or market power. *See id.* The quick look analysis, however, is the exception, not the rule. *See American Ad Management,* 92 F.3d at 789.

Variflex argues that the Court should apply the quick look rule of reason because Counterclaim Defendants' alleged conspiracy constitutes a naked restraint, or alternatively, has actual anti-competitive effects. Variflex argues that the Counterclaim Defendants' agreement had a direct impact on output because KDK agreed not to sell instant canopies in the mass merchandise segment of the market.

In addition, Variflex argues that the Counterclaim Defendants' agreement adversely affected competition because it allowed E–Z Up to charge supracompetitive prices.

■ However, these facts do not demonstrate the kind of drastic effect on price or output that would warrant application of a quick look analysis. The Ninth Circuit has held that the market's loss of one competitor is not enough to establish an impact on competition. *See Rutman Wine Co. v. E & J Gallo Winery,* 829 F.2d 729, 734–35 (9th Cir.1987). Further, charging supracompetitive prices is at the core of a patentee's rights, and is a legitimate reward of a patent monopoly. *See United States v. Studiengesellschaft Kohle m.b.H.,* 670 F.2d 1122, 1128 (D.C.Cir.1981). Thus, the Court finds that proof that Counterclaim Defendants have power in a properly defined relevant market is required.

To prove that the defendant has power in the market, the plaintiff must prove both the relevant market and that the defendant has power within the market. *See Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 (9th Cir.1988). Variflex argues that the relevant market includes only "instant" canopies, rather than all portable shades.

■ The boundaries of a relevant market are determined principally by the reasonably interchangeability of use of the products. *See Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502. Products that are reasonably interchangeable in use generally compete with each other and are thus included in the same market. *See id.* Factors to consider include "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

■ Here, it is undisputed that all portable shades serve the same function of providing shade and shelter, are sold

through the same distribution channels at similar prices, and compete with one another for consumer preference and awareness, as well as space in retail outlets. Further, it is undisputed that manufacturers sell portable shades to the same basic customer group, retailers carry several manufacturers' products, and some manufacturers, including Variflex, produce both types of canopies. While it is true that some differences in price and quality exist between the instant and piece-together canopies, courts have repeatedly rejected efforts to define markets by price or product quality variances. *See Haagen–Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.,* 691 F.Supp. 1262, 1268 (N.D.Cal.1988), *aff'd* 895 F.2d 1417, 1990 WL 12148 (9th Cir.1990).

■ Variflex offers expert testimony to the effect that instant canopies constitute a distinct submarket. In the context of antitrust law, however, if there are undisputed facts about the structure of the market that render an expert's inference economically unreasonable, the expert opinion is insufficient to support a jury verdict. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1436 (9th Cir.1995).

Variflex proposes a second test based for determining the boundaries of the relevant market: the "five-percent" test. *See Olin Corp. v. FTC,* 986 F.2d 1295, 1299 (9th Cir.1993). Under the five-percent test, the court begins with a narrowly defined product market and asks what would happen if a hypothetical monopolist attached a five percent price increase. *See id.* If the price increase causes buyers to shift to other products, the product that is the next best substitute is added to the market. *See id.*

Variflex argues that the relevant market includes only instant canopies under the five percent test because E–Z Up lowered the prices charged to at least one retailer by six percent when Variflex entered the market. Variflex argues that this evidence shows that E–Z Up was charging at least six percent over the market price for its instant canopies without consumers switch-

ing to non-collapsible canopies. However, there is no evidence that the retailer passed a corresponding price decrease along to consumers and the evidence is insufficient to prove the relevant market. Thus, the Court finds that Variflex has failed to raise a genuine issue as to the relevant market.

At oral argument, Variflex conceded that if the Court does not accept its proposed relevant market, it cannot prove that Counterclaim Defendants have power within the market. Even if the Court accepts the proposed relevant market, the evidence is insufficient to support a claim that Counterclaim Defendants have power within the proposed market to exclude competition and raise prices above competitive levels.

■ To determine whether a defendant has market power, courts look to the defendant's market share, the ease of entry into the market by new firms, and the level of competition in the market. *See* I *Antitrust Law Developments, supra,* at 61–62. Even where the defendant's market share is substantial, the absence of barriers to entry by new firms or expansion by existing firms can deprive a defendant of market power. *See id.; Western Parcel Express v. United Parcel Serv.,* 190 F.3d 974, 976 (9th Cir.1999) (finding that even where the defendant had a dominant market share, the plaintiff's claims failed because it could not establish that the defendant possessed the ability to exclude competition in its proposed relevant market based upon the plaintiff's significant growth and the entry of a new competitor into the market).

■ Here, Variflex's CEO stated in his deposition that Variflex operates in a highly competitive environment and that there are no technological or manufacturing barriers to entry. That assertion is supported by the record, which shows that Variflex's sales have steadily grown while E–Z Up's sales have declined. Further, it is undisputed that a new competitor, Enviro-

Works, has recently entered the instant canopy market.

Thus, the Court finds that Variflex has failed to make an adequate showing of Counterclaim Defendants' market power. Accordingly, the Court finds that Variflex has failed to plead sufficient evidence to establish a Section 1 conspiracy to unreasonably restrain trade.

### b. *Section 2 Conspiracy to Monopolize*

■■■ To prove a Section 2 claim for conspiracy to monopolize, a plaintiff must establish the existence a conspiracy, the relevant market that the defendants intend to monopolize, specific intent to monopolize, overt acts manifesting such intent, and a meaningful threat to competition within the market from the defendants' behavior. *See* William C. Holmes, *Antitrust Law Handbook* 519 (1999). Variflex argues that proof of a relevant market or market power is not required to establish a conspiracy to monopolize. The Supreme Court has held otherwise. "Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one." *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 455–56, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Thus, in light of the Court's findings regarding relevant market and market power, the Court finds that Variflex has failed to plead sufficient evidence to establish a Section 2 conspiracy to monopolize the market.

### 2. *Antitrust injury*

Proving antitrust injury is an essential element of a private cause of action under the antitrust laws. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 339, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). As a result, proof of antitrust injury is often a dispositive issue in antitrust litigation. *See* Holmes, *supra,* at 235.

■■■ Antitrust injury must be of the type that "the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). However, a private cause of action does not arise until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct. *See Atlantic Richfield,* 495 U.S. at 339, 110 S.Ct. 1884. As a result, to bring suit for an antitrust violation, one must make a showing that it has been economically injured and that the injury stems from defendant's violation of the antitrust laws. *See id.*

■■■ The first step in proving antitrust injury is showing that there is injury to competition. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("It is competition, not competitors, which the Act protects."). Consequently, antitrust injury will not be presumed from the antitrust defendant's conduct, but instead must be affirmatively proven and must be attributable to an anticompetitive aspect of the practice under scrutiny. *See Atlantic Richfield,* 495 U.S. at 329, 334, 110 S.Ct. 1884.

■■■ In other words, the plaintiff can only recover if its loss stems from a competition-reducing aspect of the defendant's behavior. *See id.* at 344, 110 S.Ct. 1884. This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." *Id.* at 343, 110 S.Ct. 1884.

■■■ After proving that the defendant engaged in activities proscribed by the antitrust laws, the plaintiff must show proximate cause. *See* I ABA Section of Antitrust Law, *supra,* at 761–62. Although the alleged antitrust injury need not be the sole cause of the injury claimed by plaintiff, it must be a material and direct cause. *See id.*

Variflex asserts that it has suffered economic injury because it has incurred additional expenses relating to lost or delayed sales from customers who elected not to purchase from Variflex due to Counterclaim Defendants' alleged threats. In addition, Variflex asserts that it has incurred $1.2 million in litigation costs in defending against this action and will suffer additional research and development costs if Counterclaim Defendants are successful in the enforcement of their patents because Variflex will have to design a new instant canopy.

■ The Court notes that it is undisputed that Variflex's sales have steadily increased from approximately $440,000 to nearly $7.1 million since they first entered the instant canopy market in 1997. Counterclaim Defendants argue that the Court could award summary judgment on the federal antitrust claims on this basis alone. In some circumstances, a consistent increase in sales may negate the conclusion of injury caused by antitrust violations. *See King v. Idaho Funeral Serv. Ass'n*, 862 F.2d 744, 746 (9th Cir.1988) (affirming summary judgment on antitrust claims in part because the record reflected a consistent increase in sales throughout the entire period). However, the Court finds that in light of the complex nature of this case, a more detailed analysis is necessary.

First, the record lacks admissible evidence from which a jury could reasonably infer that Variflex lost potential customers. Variflex's executives testified that they had no personal knowledge of any retailers who refused to purchase its instant canopies based on conduct by E–Z Up or its representatives. In addition, the record contains a memo from Variflex's Vice President of Sales to all sales representatives instructing them to document any improper actions by competitors. However, no sales representatives ever responded. Variflex points to statements allegedly made by E–Z Up's representatives to retailers, who passed the statements along to Variflex's independent sales representatives, who in turn passed the statements along to Variflex's executives. But these statements contain multiple layers of hearsay and are too remote to raise a genuine issue of material fact.

In addition, independent causes exist for any loss of customers or potential customers claimed by Variflex. In particular, it is undisputed that Variflex had difficulty convincing retailers to switch from an established brand to a new product. The record shows that Variflex recognized its need to revise its pricing and marketing strategies to attract new customers. The record also show that Variflex terminated its independent sales representative firm and switched to an in-house sales representative. Further, it is undisputed that Variflex experienced certain quality and production challenges when it first introduced its instant canopy. The record shows that Variflex made changes to its design in response to problems with its instant canopy and that initially production was slow.

■ Variflex also claims it will incur increased research and development costs if Counterclaim Defendants are successful in enforcing their patents. Whether the patents are enforceable is the ultimate issue in this action. If Counterclaim Defendants prevail on their patent infringement claims, the costs incurred by Variflex to remedy its proven infringement cannot constitute antitrust injury.

The only remaining damages are Variflex's litigation expenses for defending this action. Although Counterclaim Defendants argue that Variflex's litigation costs do not constitute antitrust injury as a matter of law, the Ninth Circuit has held that litigation costs incurred as a result of an action filed in violation of the antitrust laws constitute antitrust injury. *See Rickards*, 783 F.2d at 1336. In *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir.1979), for instance, the Ninth Circuit held that "[i]n a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of a prior patent infringement

suit are an injury which flows from the antitrust wrong."

 Thus, the Court finds that Variflex's litigation costs could constitute antitrust injury for purposes of summary judgment if Variflex produced sufficient evidence to support a claim that Counterclaim Defendants filed this patent infringement action as part of a conspiracy that violated the antitrust laws. As the Court has already noted, however, Variflex has failed to make such a showing. Accordingly, the Court finds that summary judgment on Variflex's federal antitrust claims is appropriate.

### B. *California Statutory Antitrust Violations*

Variflex asserts a California statutory antitrust counterclaim pursuant to the Cartwright Act, Cal.Bus.Prof.Code § 16700 et seq. The Cartwright Act is patterned after the Sherman Act, and federal cases interpreting the Sherman Act are persuasive authority under the Cartwright Act. *See Dimidowich, v. Bell & Howell,* 803 F.2d 1473, 1476 (9th Cir.1986).

Thus, in light of the Court's findings under the Sherman Act, the Court finds that Variflex has failed to produce sufficient evidence to support its California antitrust claim. Accordingly, the Court finds that summary judgment on Variflex's California antitrust claim is appropriate.

### C. *California Statutory Unfair Competition*

Finally, Variflex asserts a California statutory unfair competition counterclaim pursuant to California Business and Professions Code § 17200 et seq. The California Supreme Court adopted the following test for determining whether a defendant's conduct is unfair within the meaning of the statute: "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *See Cal–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

Thus, in light of the Court's findings under the Sherman Act, the Court finds that Variflex has failed to produce sufficient evidence to support its California unfair competition claim. Accordingly, the Court finds that summary judgment on Variflex's California unfair competition claim is appropriate.

IT IS SO ORDERED.